UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| EUGENE WOODARD, | ) | CASE NO. 1:98CV1403 |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | JUDGE SOLOMON OLIVER, JR. |
| | ) | |
| BETTY MITCHELL, WARDEN, | ) | |
| | ) | <u>MEMORANDUM OF OPINION</u> |
| Respondent | ) | <u>AND ORDER</u> |

Eugene Woodard  ("Woodard" or "Petitioner") petitioned this court for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.   The court issued a Memorandum of Opinion on September 30, 2004,

denying all but two of Woodard's claims for relief (Doc. No. 110).   Thereafter, Woodard moved the court

to conduct discovery pertaining to his first and second claims for relief, the two claims not dismissed in the

court's Memorandum of Opinion (Doc. No. 111).   The court granted the requested discovery and held

that, upon its completion, if either party wished to hold an evidentiary hearing, that party should file a motion

requesting one within seven days (Doc. No. 113).   The court also accepted Petitioner Woodard's offer

to supplement the record with documents obtained from trial counsel's files.   Woodard furnished those

records to the court on January 25, 2005 (Doc. No. 114).

Upon the conclusion of discovery, the Respondent moved the court for an evidentiary hearing

(Doc. No. 115).   Petitioner Woodard did not oppose the motion.   On May 5, 2005, the court granted the

motion, setting the hearing date for June 14, 2005 (Doc. No. 116).  After holding a brief hearing on that date, the court continued the hearing on July 25, 2005.  Thus, these claims have been fully factually developed and are ripe for disposition.  For the reasons discussed below, the court grants a writ of habeas corpus as to the first and second grounds for relief raised in the Petition.

## I. Habeas Proceeding[1]

As stated above, the court denied all but two of the claims Woodard raised in the Petition.  In these claims, Woodard raised ineffective assistance of counsel for failing to investigate and prepare for the mitigation phase of trial.  The court reasoned that it could not adjudicate those claims because the record before it was incomplete.  It held, in pertinent part, as follows:

> In these grounds for relief, Woodard asserts that his counsel were ineffective for failing to investigate and present evidence of his family background, upbringing, and mental condition and present it during the mitigation phase of trial.  The Respondent asserts that this claim is procedurally defaulted.  The Eighth District Court of Appeals found these claims were barred by *res judicata* because Woodard could have raised them on direct appeal.  The Eighth District found that, although one of Woodard's attorneys remained as counsel on direct appeal, his second counsel was newly appointed.  Woodard's second attorney, the court opined, was both able and actually did raise ineffective assistance of trial counsel claims on direct appeal.  *State v. Woodard*, 1998 WL 23884, at *2.  As stated above, the court finds that, pursuant to Ohio law at the time of the appeal, Woodard's appellate counsel could have raised ineffective assistance of trial counsel claims on direct appeal.
>
> Woodard contends that this court should find that, because these ineffective assistance claims are based on evidence outside the record, this court should find consequently that the Eighth District Court of Appeals erred in finding *res judicata* applicable.  In its decision, the Eighth District Court held:
>
> > Woodard also argues *res judicata* does not apply to his ineffective

---

[1]  The court does not recount the facts of the underlying aggravated murder conviction in this Opinion.  For a complete recitation of these facts as found by the Ohio Supreme Court, *see* Doc. No. 110, at 17-19.

assistance of counsel claims because they were based on evidence dehors the record. *See State v. Combs* (1994), 100 Ohio App.3d 90, 97. Woodard attached various exhibits to his petition for post-conviction relief, including several affidavits. However, even if we accept the affidavits and other evidence as true, Woodard has not shown how any of the exhibits are relevant to his claim of ineffective assistance of counsel. "To substantiate a claim that counsel's performance was ineffective, a defendant must submit evidentiary documents containing sufficient operative facts to demonstrate a substantial violation of an essential duty by counsel and that the defense was prejudiced by counsel's performance." *State v. Powell* (1993), 90 Ohio App.3d 260, 270 [citing *State v. Bradley* (1989), 42 Ohio St.3d 136.]

Evidence outside the record by itself, however, will not guarantee a right to an evidentiary hearing. To overcome the *res judicata* bar, the evidence must show that the petitioner could not have appealed the constitutional claim based on the information in the original trial record.

*State v. Combs* (1994), 100 Ohio App.3d 90, 97.

Absent any evidence that any evidence outside the record was necessary to determine Woodard's ineffective assistance of counsel claims, the trial court correctly dismissed the claims on the basis of *res judicata.*

*Id.* at *3.

The court finds that the Eighth District Court of Appeals' holding fails to provide a clear evidentiary basis for its decision to which this court can defer.  Moreover, in this court's own judgment, it appears that the rather voluminous records depicting Woodard's family background and upbringing were not contained in the trial court record.  Thus, this claim could not have been raised on direct appeal.  The court finds that the trial court likely erred in this ruling.  For this reason and for the reasons pertaining to the merits of claims one and two below, the court will hold an evidentiary hearing on this issue.

Because the state courts never rendered any opinion on the merits, this court must examine the merits of Woodard's claims.  In so doing, the court finds that the record before it is insufficient for the court to render its opinion.  Thus, the court must hold an evidentiary hearing to factually develop these claims.  The court sets forth its reasoning below.

In grounds for relief one and two, Woodard asserts that his trial counsel were ineffective for failing to investigate and develop mitigation evidence regarding his mental condition, family background, and upbringing.  Specifically, Woodard asserts that trial counsel should have procured both a psychologist and mitigation expert to prepare evidence that they could present during mitigation.  Had they done so, trial counsel would

have procured information revealing that Woodard grew up in a poor family, that his father, a member of a crime gang, used Woodard for his drug sales when Woodard was as young as eight years old, and that Woodard's mother had a relationship with a man who was involved in extensive criminal activity.  He battered her mother in front of Woodard and eventually went to prison for shooting her.  *Id.* at Def. Exh. 16.  None of this information was presented during Woodard's mitigation hearing.  Because some of this evidence may have swayed at least one juror to vote for a sentence less than death, the court must determine whether counsel's decision to forego its introduction during mitigation proceedings was reasonable under the appropriate standard.

A review of the need for factually developing these claims must begin with what mitigation evidence counsel presented during trial.  That undertaking is decidedly brief in this instance.  During the mitigation hearing, counsel presented only the testimony of Marsha and Tonya Woodard, Woodard's mother and sister, and Woodard's own unsworn statement.  Woodard's mother and sister testified that Woodard was a good son and brother and that he deserved mercy.  Woodard expressed remorse for Akram's death, but asserted that he was not Akram's shooter.

Based upon the record before the court, it appears that upon conclusion of the guilt phase of trial, defense counsel hired psychologist Dr. Sandra McPherson.  She averred during post-conviction proceedings, however, that while she spoke with defense counsel and with Woodard's mother, defense counsel never requested that she interview or perform a psychological evaluation on Woodard (Doc. No.  31, Exh. 15, at Def.'s Exh. 29).  The record does not reveal, however, what, if any, further investigation trial counsel undertook.  During post-conviction proceedings, post-conviction counsel hired Dr. Sharon L. Pearson to interview and examine Woodard, who averred to the information regarding Woodard's background and upbringing that the court noted above.

It is clear from the record that Woodard's jury was uninformed about mitigating evidence that could have altered their decision to sentence him to death.  While the Respondent states that much of the mitigation evidence elucidated during post-conviction proceedings was testified to during trial, that assertion cannot be substantiated.  Neither Marsha nor Tonya Woodard testified to the fact that Woodard's father was imprisoned until he was eight years old, that upon release from prison, his father used Woodard as a drug smuggler to further his drug dealing business, or that Woodard's only other father figure, Alonzo Eberhardt, was abusive towards his mother in front of Woodard.  There was simply no attempt during mitigation proceedings for counsel to place Woodard's criminal act within the context of the social background in which he was raised.

More importantly for purposes of this court's analysis, there is nothing in the record that reveals the extent of defense counsel's investigation or procurement of any of the above information.  Thus, it is impossible to discern whether counsel's possible decision not to conduct a background investigation was reasonable under *Wiggins*.  Without this pertinent information, the court is unable to decide whether counsel acted reasonably in failing to present any of this evidence during the mitigation proceedings.

-4-

Thus, the court must factually develop this claim to determine whether counsel performed any investigation into Woodard's family history and background.

\* \* \*

It is clear from the record that a hearing or other means of factual development is necessary to ascertain what actions, if any, defense counsel undertook in preparing for and investigating Woodard's background prior to the penalty phase of trial.[2] Woodard is not precluded from a hearing or other means of factual development because he did not "fail to develop" this claim in state court. Although he presented it at the first opportunity available to him, the state court barred this claim, as stated above, on grounds of *res judicata* and refused to hear it. Thus, pursuant to the *Williams* holding, § 2254(e) should not bar this claim because he diligently pursued it in state court. The court will, however, entertain any argument regarding the defaulted status of those claims as they relate to the court's finding that these claims were supported in post-conviction relief by evidence *dehors* the record.

(Doc. No. 110, at 43-53.)

Upon completion of pre-hearing discovery, the court held its first of two days of evidentiary hearings as to the first and second grounds for relief. On June 14, 2005, Woodard called several family members to testify regarding their contact with defense counsel and their availability to testify during Woodard's mitigation hearing.[3]

Woodard first called Marsha Graves, his mother. She testified that, although she was present at the trial every day, she met with defense counsel for the first time just prior to her mitigation phase testimony in a witness room. Defense counsel then told her that she should plead for her son's life. She further stated

---

[2]     Woodard previously had requested that this court grant him an evidentiary hearing to develop facts relating to his first and second grounds for relief. (Doc. No. 45, at 19-23.) The court denied the motion without prejudice, (Doc. No. 64, at 10), but habeas counsel did not re-file the motion.

[3]     During this hearing the court also entertained argument on the procedural issue of whether Woodard could submit his affidavits in lieu of testimony or whether the court should exclude these affidavits on hearsay grounds. Out of an abundance of caution, the court concluded that the witnesses should testify regarding the contents of their affidavit to avoid any subsequent evidentiary issues.

that, although she was available to provide counsel with background information, neither counsel nor anyone else on the defense team ever questioned her about Woodard's schooling or family life.  Graves claimed that she was in contact with Leo Clayton, Woodard's father, throughout the trial and would have been able to contact him if asked.  On cross-examination, Graves admitted that in her post-conviction affidavit she averred that she had not seen Clayton at the time of the trial.

Clayton next testified during the evidentiary hearing.  He indicated that he was not aware of any efforts by defense counsel to contact him.  He explained that he was not present at the trial because there was an outstanding warrant for his arrest on a minor felony.  He contended, however, that if counsel had contacted him and asked him to testify, he would have done so despite the outstanding charges.

Finally, Woodard called his sister, Tonya Woodard, to testify on the first day of the hearing.  Tonya stated that she met with defense counsel briefly in the hallway just prior to her mitigation phase testimony. At that time, Tonya asserted, counsel asked her to "plead and beg" for her brother's life, (Doc. 135, at 64). Although on cross-examination Tonya noted that her post-conviction affidavit stated that counsel had contacted her on one other occasion to discuss a co-defendant, she asserted on re-direct that defense counsel's only conversations with her regarding her mitigation testimony occurred just prior to her providing it.

Woodard called several witnesses on the second day of testimony.  He first called Dr. Sharon Pearson, a psychologist who examined Woodard during state post-conviction proceedings and submitted an affidavit of her findings to the post-conviction court.  Dr. Pearson first stated that the assertions she submitted in her affidavit were correct.  She testified that she reached her conclusions by performing several tests on Woodard when meeting with him on two occasions.  Additionally, she obtained materials regarding

-6-

Woodard's background and upbringing from a mitigation specialist hired by the Ohio Public Defender (hereinafter "OPD") during post-conviction proceedings.  She concluded that Woodard suffered from an undiagnosed attention deficit hyperactivity disorder (hereinafter "ADHD").

Moreover, she referred to her affidavit regarding the social and familial factors that influenced Woodard's life.  Specifically, she averred in her affidavit that, as stated above, Leo Clayton was a drug trafficker in the community in which he lived and that he used Woodard as a courier in his drug sales upon his release from prison when Woodard was eight years old.  Woodard frequently flew to Chicago to obtain drugs from Clayton's drug suppliers.  He also delivered drugs and collected payment from local purchases.  By the age of 12 or 13, Woodard had taken charge of Clayton's drug business, which had foundered because of Clayton's increase in personal drug use. Pearson also noted that while Clayton was in prison, Marsha Woodard became involved with Alonzo Eberhardt, a known underworld figure.  He was physically abusive toward Marsha in front of Woodard and his sister Tonya, at times threatening her with a gun.  He eventually went to prison for shooting her.

On cross-examination, Dr. Pearson stated that tests indicated Woodard was not suffering from mental retardation.  She also stated that because of Woodard's undiagnosed ADHD, he lacks impulse control.  She conceded that in her report she had indicated that Woodard tended to engage in risky behaviors, that he was self-serving and manipulative, and that he views himself as a victim who is unjustly blamed for other's problems.  She revealed that, had she been called to testify during trial, she would have spoken about these features of Woodard's personality.

Habeas counsel next called Petitioner Woodard to testify in his own behalf.  He stated that his lawyers spoke to him regarding mitigation only after he was convicted.  This meeting, Woodard testified,

-7-

lasted approximately twenty minutes.  Woodard testified that counsel at that point asked him how they could make contact with his family members.  Woodard responded by giving his attorneys information regarding how they could reach his mother, father, and some friends.  Woodard stated that any further family members could be contacted through either his mother or father.  He testified that counsel met with him a second time briefly to obtain the names and contact information for other individuals who could serve as witnesses on his behalf.  At that time, Woodard reported, counsel also told him that he would be going to the Probation Department, where he would be questioned.

According to Woodard, counsel did not ask for any further information regarding his family.  When Woodard asked counsel why they did not contact his father, one of his attorneys  responded that  "he thought he had the case beat" with the testimony of his mother and sister, (Doc. No. 136, at 36).  Although defense counsel had hired an investigator, Ned Perroti, to prepare for trial, Woodard testified that Mr. Perroti never spoke with him regarding his teachers, medical or school records, or family background.

When asked whether his attorneys ever informed him about what their strategy would be during the sentencing phase, Woodard responded: "There pretty much was no sit-down.  It was just, get up there and beg for your life and say you're healed.  That's all they kept telling me to do."  (Doc. No. 136, at 44).  On cross-examination, Woodard admitted that he told Probation Department officials that he did not know how to contact his father.

Habeas counsel next called Mr. Charles See to testify.  See, who runs a community reentry program for former inmates attempting to reenter society, testified that he first became involved with Woodard's case when the OPD contacted him during post-conviction proceedings.  His task at that point was to review Woodard's background to discern whether he had been impacted by inner-city culture.  He

-8-

then prepared an affidavit for the OPD to submit to the post-conviction court.  He testified that the information provided in the post-conviction affidavit was correct.

In explaining his statements in the affidavit, See testified that Woodard's mother, who gave birth to Woodard at a young age, was ill-equipped to raise him.  See further explained that Woodard's father and other paternal family members had an extensive history of illegal activity, in which Woodard became involved:

> His father, Leo Clayton, lived . . . in a community where he was involved in crime and illegal activity where he trafficked in drugs, where he was known, he and his brother, as very dangerous individuals in the community.  He and his brother had been involved in the criminal justice system as juveniles as well as adults.
>
> * * *
>
> So his family and extended family had an extensive history of being involved in the criminal justice system and being involved in illegal activities.  Eugene was a small boy.  It's my understanding his father, Leo, used him to traffic in drugs, I think at the age of eight used him as a courier.  When he was 12 years old he transported drugs for his father.

(Doc. 136, at 64-5).  See testified that the "Clayton boys," as Woodard's father and uncle were known, were well respected in their community, that they were well-dressed men who were frequently seen, and were admired by youths and peers in their neighborhoods.  See also testified about Alonzo Eberhardt, the man with whom Woodard's mother developed a relationship after Woodard's father went to prison.  Eberhardt, who became a surrogate father for Woodard, was a "known underworld figure."  *Id.* at 67.

Finally, Woodard called Dr. Sandra McPherson to testify during the hearing.  Dr. McPherson, a

clinical psychologist, testified that defense counsel contacted her to provide them with mitigation information after the culpability phase of trial had concluded.  She stated that there was insufficient time in which to provide counsel with a thorough investigation and report.  She explained:

> It's impossible to do a responsible job of mitigation in - - - in a few day's time.  The scope of mitigation is such that one needs to do assessment, psychological assessment.  One needs to obtain a great deal in the way of records.  Among other things, persons that are being psychologically assessed, even when one is doing it well in advance of actual trial time, have both agendas and experiences which can affect how they respond to the test.  I cannot rest simply on psychological tests in coming to conclusions about an individual and how they are functioning.  I need to get ancillary information.  I need to talk to people who know them and knew them prior to the time of the act.  I need to get records about their actual behavior and functioning in other settings.  There sometimes is an issue of intelligence, to take a relatively simple aspect.  If I get a low finding on an intelligence test, I need to back that up with getting prior intelligence tests or prior records from schools in order to determine whether or not this is a serial finding or a long term well established condition.  So I need to do a fair amount of investigative work to find out even relatively basic kinds of things.  I need to talk with people and get some sense of how they related to this individual and how he related to them.

(Doc. No. 136, at 87-8).

McPherson testified that after defense counsel contacted her, she spent approximately one professional hour on the case.  At the hearing, she identified a document as an envelope defense counsel

-10-

had mailed to her that contained Woodard's school and juvenile court records.  McPherson stated that she

no longer has a file in her office pertaining to Woodard's case.  She recalled that she spoke with

Woodard's mother.  She did not, however, prepare a psychological report or testify during the mitigation

hearing.

Thereafter, all parties stipulated to the admission of an affidavit prepared by Mr. Perroti, in which

he stated that the investigative work he performed on the case was exclusively concerning the guilt phase

of trial.  The court heard closing arguments from both counsel and the hearing concluded.

### A. Decisional Law

The *Strickland v. Washington*, 466 U.S. 668 (1984) test, pronounced over twenty years ago,

is the familiar standard for evaluating ineffective assistance of counsel claims.  Specifically, *Strickland*

dictates that a petitioner must satisfy a two-prong test to establish ineffective assistance of counsel.  First,

the petitioner must demonstrate that counsel's errors were so egregious that "counsel was not functioning

as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.*  Second, the petitioner must show

that he or she was prejudiced by counsel's errors.  The *Strickland*  Court held that, "[t]his requires

showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result

is reliable." *Id.*

To assert a successful ineffective assistance of counsel claim, a petitioner must point to specific

errors in counsel's performance.  *United States v. Cronic*, 466 U.S. 648, 666 (1984).  Thereafter, the

*Strickland* Court held, a reviewing court must subject the allegations to rigorous scrutiny, determining

"whether, in light of all circumstances, the identified acts or omissions were outside the wide range of

professionally competent assistance." *Strickland*, 466 U.S. at 690.  A reviewing court must strongly

-11-

presume that counsel's conduct was reasonable and might be part of a trial strategy. *Id.* at 689. As the Supreme Court recently affirmed in *Bell v. Cone*, "'Judicial scrutiny of a counsel's performance must be highly deferential' and . . . 'every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Bell v. Cone*, 535 U.S. 685, 698 (2002)(quoting *Strickland*, 466 U.S. at 689).

Since the Supreme Court decided *Strickland*, that Court, as well as the Sixth Circuit Court of Appeals, has issued several important opinions expounding on the *Strickland* standard. In *Wiggins v. Smith*, 539 U.S. 510 (2003), the Supreme Court held that counsel's failure to investigate and present to the jury mitigating evidence constituted a Sixth Amendment violation. There, the Court held that trial counsel's failure to discover evidence of the petitioner's difficult childhood was a Sixth Amendment violation.[4] The Court found that counsel's decision not to expand their investigation in the wake of reviewing several documents diagnosing the petitioner's mother as an alcoholic and the petitioner's placement in several foster homes was an abdication of the duties imposed on counsel pursuant to *Strickland*.

The *Wiggins* Court cautioned, however, that "a court must consider not only the quantum of

---

[4]     The Court noted the extensive hardships the petitioner faced during childhood:

> [P]etitioner's mother, a chronic alcoholic, frequently left Wiggins and his siblings home alone for days, forcing them to beg for food and to eat paint chips and garbage. Mrs. Wiggins' abusive behavior included beating the children for breaking into the kitchen, which she often kept locked. . . . Petitioner's first and second foster mothers abused him physically and . . . the father in his second foster home repeatedly molested and raped him.

*Id.* at 516-17 (citations omitted).

-12-

evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Id.* at 527.  While *Strickland* established that strategic decisions can be virtually unchallengeable, the *Wiggins* Court emphasized that these decisions are not immune from attack if they are founded upon an unreasonable investigation. *Id.* Finding that the information the petitioner's trial counsel already had reviewed triggered a duty to investigate the petitioner's background further, the Court held that trial counsel's actions were objectively unreasonable under *Strickland*.

The Supreme Court again emphasized counsel's duty to investigate for mitigating evidence in its recent decision *Rompilla v. Beard*, – U.S. – , 125 S.Ct. 2456 (2005).  There, the Court held that defense counsel had a duty to investigate for mitigating evidence despite the defendant's and his families' insistence that none existed.  The Court found counsel's performance ineffective when they failed to review the court file containing the defendant's prior convictions even though counsel knew that the prosecution would be using this conviction, including reading portions of a prior trial transcript in which the defendant committed a similar offense to the one at issue during trial, to bolster its support for an aggravating factor during the sentencing proceeding.  *Id.* at 2464.  While the Court credited counsel with some efforts to obtain mitigating evidence, it held that counsel's failure to review the prior conviction file, despite their knowledge that the prosecutor intended to utilize it and the ease with which counsel could have obtained it, rendered their assistance below the constitutional minimum required under the Sixth Amendment.  *Id.* at 2467.

The *Rompilla* Court also observed the multitude of mitigating evidence to which counsel would have availed themselves had they reviewed the prior conviction file.  Records contained in this file revealed that the defendant was reared by alcoholic parents, that Rompilla's father regularly beat him and his mother, that the family home was filthy, and the children were not given clothing, attending school "in rags."  *Id.* at

2468-69. Based on these circumstances, the *Rompilla* Court held that counsel's failure to review the prior conviction file prejudiced the outcome of the sentencing proceeding.[5]

The Sixth Circuit Court of Appeals also has issued several recent opinions regarding counsel's Sixth Amendment obligations in the mitigation phase of a capital case. In *Hamblin v. Mitchell*, 354 F.3d 482, 486 (6th Cir. 2003), the Sixth Circuit held that courts must review trial counsel's actions in light of the American Bar Association's guidelines. Those guidelines suggest the need for counsel to explore a petitioner's medical, educational, and employment history, as well as obtaining a family and social history through, *inter alia*, contact with family members. *Id.* at 487 n.2. The guidelines also state the necessity of reviewing a multitude of records to provide counsel with clues regarding the client's "childhood abuse, retardation, brain damage, and/or mental illness . . . ." *Id.*

Moreover, in *Frazier v. Huffman*, 343 F.3d 780 (6th Cir. 2003), *cert denied*, 541 U.S. 1095 (2004), the Sixth Circuit held that counsel acted in violation of *Strickland* when they failed to procure evidence that the petitioner sustained a brain injury that impaired his brain functioning. *Id.* at 794. Although aware of this injury, counsel did not investigate its occurrence or the possible impact it may have had on

---

[5]    In her concurring opinion, Justice O'Connor took pains to observe that, contrary to the dissent's contention, the Court was not holding that counsel must always review all documents in a prior conviction file. *Id.* at 2469. Instead, she opined, three circumstances of that particular case required counsel to make this inquiry. First, she noted that defense counsel were aware that the prosecution was going to use details of the prior conviction to prove an aggravating circumstance. Moreover, defense counsel knew that the prosecution's use of the prior conviction would undercut counsel's planned mitigation strategy of arguing residual doubt. Finally, Justice O'Connor reasoned that counsel's failure to review the prior conviction file was a result of counsel's inattention, rather than part of some reasoned strategic judgment. *Id.* at 2471.

the petitioner's behavior and commission of the crime.  Moreover, counsel failed to present any mitigating evidence, other than the petitioner's unsworn statement, during the mitigation phase of trial.  The Sixth Circuit held that counsel's failure to investigate could not be part of a reasonable trial strategy.  *Id.* at 795. Thus, it concluded, the state court had unreasonably applied *Strickland* in its contrary finding.

In several other Sixth Circuit cases, however, the court held that counsel did not provide ineffective assistance during the mitigation phase of trial when the petitioner could not establish how counsel's alleged unreasonable conduct prejudiced the outcome of the sentencing proceeding.  In *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005), for example, the court held that counsel were not ineffective for failing to hire a mitigation psychologist until the day before the mitigation phase of trial when the defendant previously had been examined by several psychologists.  The court  reasoned that the petitioner could not substantiate an ineffective assistance claim because he could not demonstrate that testimony from a psychologist with more time to prepare for mitigation would have differed significantly from the testimony the psychologist actually provided during the mitigation proceedings.  *Id.* at 316.  Thus, the court found that the petitioner could not establish the prejudice necessary to demonstrate counsel's ineffectiveness.

Similarly, in two other Sixth Circuit opinions, the court found that petitioner could not establish that counsel's alleged acts or omissions prejudiced the outcome of the mitigation proceeding.  First, in *Thompson v. Bell*, 315 F.3d 566 (6th Cir. 2003), *cert. denied*, 540 U.S. 1051 (2003), the Sixth Circuit held that counsel could not establish ineffective assistance of counsel for failure to discover evidence that the petitioner suffered from organic brain damage when the petitioner was unable to establish in any post-trial proceeding that he suffered from such a malady.  Although the petitioner had presented some inferences after trial that he had brain damage and was currently suffering from schizo-affective disorder,

the Sixth Circuit found such inferences could not lead it to the conclusion that counsel did not act diligently during trial. It reasoned, "absent some evidence of organic brain damage or mental illness at the time of the crime, trial counsel cannot be deemed ineffective for failing to discover something that does not appear to exist." *Id.* at 590.

Finally, the court held in *Smith v. Mitchell*, 348 F.3d 177 (6th Cir. 2003), *cert. denied*, – U.S. – , 125 S.Ct. 278 (2004), that because virtually all of the mitigating evidence petitioner asserted during the habeas proceedings was presented to the three-judge panel during the mitigation hearing, the petitioner could not establish prejudice under *Strickland*. Thus, the court held that counsel's representation was not in violation of the Sixth Amendment.

## B. American Bar Association Guidelines

Several of the cases examined above uphold the American Bar Association (hereinafter "ABA") guidelines as the paradigm for defense counsel performance in capital cases.[6] These guidelines set forth instructions regarding how trial counsel should prepare for the mitigation phase of a capital trial. The guidelines state, in regard to mitigation, that counsel should begin their initial preparation for that phase of trial "immediately upon counsel's entry into the case and should be pursued expeditiously." ABA Guideline 11.4.1 (1989). It further states that any investigation for the sentencing phase of trial should include, but not be limited to:

> medical history, (mental and physical illness or injury, alcohol and drug use, birth trauma, and developmental delays); educational history (achievement, performance and behavior) special educational needs (including cognitive limitations and learning disabilities); military

---

[6] The ABA has published several editions of the Guidelines. For purposes of performing a proper *Strickland* analysis, the Court utilizes the 1989 edition of the guidelines as that was the most recent edition published at the time of Petitioner Woodard's trial.

history (type and length of service, conduct, special training); employment training history (including skills and performance, and barriers to employability); family and social history (including physical, sexual or emotional abuse); prior adult and juvenile record; prior correctional experience (including conduct on supervision and in the institution, education or training, and clinical services); and religious and cultural influences.

ABA Guidelines at 11.4.1.(2)(B) (1989).

In addition to this extensive investigation, the guidelines propose several steps for counsel to take in preparation for their mitigation presentation.  They suggest that counsel discuss the sentencing phase with the client.  ABA Guideline 11.8.3 (1989).  While the guidelines emphasize that the preparation for each case is necessarily distinct because it must involve an assessment of the individual defendant, it lists topics that counsel should consider presenting during sentencing, such as: (1) medical history; (2) educational history; (3) military service; (4) employment and training history; (5) family and social history; (6) rehabilitative potential of the client; (7) record of prior offenses; (8) expert testimony concerning any of the above . . . .  ABA Guideline 11.8.6 (1989).

The commentary to the guidelines emphasizes that counsel must be proactive in their mitigation investigation and preparation.  It states:

Obviously, the uniqueness of every client makes guidelines as to the sentencing phase a starting point, not a checklist.  However, counsel in every capital case should consider strategies offered by other attorneys, discussed in the literature or otherwise available for consideration.  Counsel may not choose, without investigation and preparation, to sit back and do nothing at sentencing.

ABA Guideline 11.8.6. cmt.(1989).

### III. Analysis

Before discussing the merits of Woodard's ineffective assistance claims, the court must first determine whether it is precluded from reviewing the claims because they have been procedurally defaulted.

-17-

As stated above, the court previously held that on appeal from the trial court's denial of post-conviction relief, the Eighth District Court of Appeals held that Woodard's ineffective assistance of mitigation claims were barred on grounds of *res judicata* because he could not demonstrate that he was precluded from raising the claims on direct appeal.  The court previously held that these claims were likely not procedurally defaulted because they were not part of the trial record and, thus, could not have been raised on direct appeal.  Neither party addressed the procedural default issue during the evidentiary hearing.

Since its previous Memorandum of Opinion, however, the Sixth Circuit Court of Appeals has issued a decision which provides further guidance to the court.  In *Hill v. Mitchell*, 400 F.3d 308 (6th Cir. 2005), *petition for cert. filed*, No. 05-6535 (Sept. 15, 2005), the Sixth Circuit held that when a habeas petitioner raises an ineffective assistance of counsel claim based on evidence outside the record, that claim is not procedurally defaulted even if the state post-conviction court finds to the contrary.  Similar to this case, the petitioner in *Hill* had presented an ineffective assistance of counsel claim regarding counsel's preparation for the mitigation proceedings in a post-conviction petition.   While the state court of appeals commented that it was "puzzled by counsel's seeming inattention," it held that the claim was barred by *res judicata* because it could have been raised on direct appeal.  *Id.*   Thus, it refused to review the merits of the claim.

On appeal from the district court's denial of habeas relief, the Sixth Circuit observed that, pursuant to Ohio law, a criminal defendant is not required to raise ineffective assistance claims on direct appeal when evidence outside the direct-appeal record is presented.  *Id.*  Agreeing with the district court's procedural approach to the claim, the Sixth Circuit held that because the petitioner could not have raised this claim on direct appeal, it was therefore not barred by *res judicata.*  Thus, the court concluded, *de novo* review

of the claim was appropriate.

The *Hill* Court's holding is dispositive of this issue.  Because Woodard, like the *Hill* petitioner, raised the ineffective assistance of counsel claims during post-conviction proceedings and based them on evidence outside the record, the trial court and court of appeals erred when they barred these claims on grounds of *res judicata*.  Similar to the *Hill* Court, this court finds that Woodard's first and second grounds for relief could not have been raised on direct appeal and, thus, are entitled to a *de novo* review before this court.

In reviewing the merits of Woodard's first and second grounds for relief, the court finds that they are well-taken.  First, the court finds that counsel failed to conduct an adequate investigation into Woodard's familial and social history.  Several family members testified during the evidentiary hearing that they were available, but not contacted by counsel prior to the mitigation proceedings.  Moreover, although counsel procured some juvenile court and school records regarding Woodard's background, it appears that counsel performed no investigation whatsoever into Woodard's family history.  Thus, they were unaware of Clayton's use of Woodard as a drug courier when he was as young as eight years old or that Woodard attempted to run his father's drug business when at the age of twelve or thirteen when his father's own increasing drug use prevented him from doing so.

Because of counsel's failure to investigate Woodard's family background, counsel also did not know about the abuse that occurred in Woodard's home.  They could not have known that Eberhardt physically assaulted Marsha in front of Woodard or that he went to prison for shooting her.  Importantly, these facts likely would not have been difficult to unearth.  While Woodard or his immediate family members may have been reluctant to discuss the familial abuse, court records regarding Eberhardt's

conviction or interviews with extended family members easily would have revealed the bases for the charges that led to Eberhardt's imprisonment.

Counsel's failure to conduct these basic interviews and record searches are contrary to what was required of them by the ABA guidelines.  As stated above, the guidelines recommend that counsel begin their mitigation investigation "immediately upon entry into the case." ABA Guideline 11.4.1 (1989).  Contrary to that recommendation, defense counsel here performed little investigation until after Woodard's guilt conviction.  While counsel apparently procured some juvenile court and school records prior to the mitigation proceedings, counsel made no other attempts to procure mitigation information, including the simple task of interviewing their client and his immediate family members, until he had been convicted of capital murder.  Finally, although counsel requested and obtained from the trial court funds to hire an investigator, counsel failed to utilize him to perform any mitigation investigation.

Also contrary to the ABA guidelines, counsel failed to discuss their mitigation strategy with Woodard prior to the commencement of those proceedings.  As Woodard testified, he learned that counsel were going to call only his mother and sister to testify after they had provided their testimony.  It was at that time that counsel informed Woodard that they believed other testimony was unnecessary.  Counsel also failed to provide Woodard with basic information regarding the nature of a mitigation hearing, telling him only that he should take the stand and "beg for [his] life and say [he was] healed." (Doc. No. 136, at 44).  At no time did counsel explain to Woodard the nature of the proceedings he was about to endure or the purpose of his testimony.

Based on the augmented record, it appears that defense counsel's strategy during the mitigation proceedings was one of mercy and perhaps residual doubt.  The court does not hold that such a strategy

in every case would constitute ineffective assistance of counsel. The issue in this case, however, is whether under the facts and circumstances presented here defense counsel afforded Woodard the effective assistance of counsel to which he is entitled under the Sixth Amendment. The Respondent has argued here that, because many of Woodard's school records and his juvenile record, which included a conviction for incorrigibility and a charge of rape, could have persuaded counsel not to present testimony regarding Woodard's background for fear of the prosecution's introduction of these facts during a rebuttal argument, their decision to utilize a mercy strategy was a reasonable one.

As *Wiggins* teaches, however, strategic decisions are not immune from attack if they are founded upon an unreasonable investigation. *Wiggins*, 539 U.S. at 527. Here, it appears that, other than a cursory request for some court and school records and an eleventh-hour attempt to contact a psychologist, counsel made no effort to investigate Woodard's background for mitigation evidence. Thus, any strategy counsel developed prior to the penalty phase of trial was an uninformed one. Accordingly, the court finds defense counsel's conduct in investigating and preparing for the mitigation proceedings was unreasonable.

The court also finds counsel's conduct was prejudicial to the outcome of the mitigation phase of trial. Rather than the jury placing the murder Woodard committed in the context of the life events he experienced, the jury heard only the pleas of his mother and sister. They were left uninformed about the effects that the actions of his father in using him for drug sales and a second father figure, who subjected his mother to physical abuse, may have had on his life. This evidence may have swayed at least one juror to vote for a sentence less than death.

As stated above, the Respondent urges the court to find that there was sufficient evidence damaging to Woodard's mitigation case, such as his school and juvenile records, as well as a lack of finding of a

-21-

severe mental disorder to demonstrate a lack of prejudice. This argument is not without force. At the time of Woodard's trial, the Ohio Supreme Court had decided *State v. DePew*, 528 N.E.2d 542 (Ohio 1988). In that case, the court held that if a criminal defendant or mitigation witness misrepresents or inaccurately describes his or her criminal history, then the prosecutor "may rebut false or incomplete statements regarding the defendant's criminal record." *Id.* at 555.[7] Thus, according to the Respondent, any information regarding Woodard's character and background would have opened the door to the prosecution's introduction of damaging rebuttal evidence. Consequently, the Respondent argues, counsel's failure to introduce mitigating evidence would not have prejudiced the outcome of the sentencing phase of trial.

As the Sixth Circuit recently held in *Mason v. Mitchell*, 320 F.3d 604 (6th Cir. 2003), however, not all mitigation evidence under the *DePew* holding would have opened the door to such rebuttal evidence. In *Mason*, the petitioner asserted that his counsel were ineffective for failing to investigate and present mitigating evidence but the district court denied this claim. In remanding the case to the district for a hearing on this issue, the Sixth Circuit observed that defense counsel's presentation of the petitioner's family history would not have opened the door to rebuttal evidence under the *DePew* holding. It stated, "[t]estimony that simply put [the petitioner's] childhood into context without misrepresenting it would not have been subject to the prosecutor's rebuttal evidence, which mostly concerned [the petitioner's] character." *Id.* at 627.

Similarly, the evidence that the Respondent states was unfavorable to Woodard related principally to Woodard's character and prior bad acts. Had defense counsel merely presented the testimony

---

[7]     The Ohio Supreme Court later expanded the scope of a prosecutor's ability to introduce rebuttal evidence in *State v. Jalowiec*, 744 N.E.2d 163, 176 (Ohio 2001).

-22-

regarding Woodard's relationships with Clayton and Eberhardt in the context of presenting Woodard's family background, there is a substantial likelihood that any rebuttal evidence regarding Woodard's character would not have been admissible during trial. Thus, the Respondent's argument must fail.

The Respondent also argues that in cases in which habeas courts have granted a petition for writ of habeas corpus on grounds of ineffective assistance of counsel claims, the petitioner has presented substantially more compelling prejudicial testimony, such as physical or mental abuse, or severe mental health issues, than that presented here. While there are more clear-cut claims of counsel's ineffective assistance prejudicing the outcome of a trial, the court nevertheless finds that its confidence in the outcome of Woodard's mitigation proceedings has been undermined. Thus, the court finds that counsel's unreasonable conduct was prejudicial to that phase of the trial. In so finding, the court concludes that Woodard has demonstrated that he is entitled to habeas relief pursuant to *Strickland v. Washington*.

### IV. Conclusion

Because the court finds that Woodard's trial counsel acted unreasonably in investigating and preparing for the mitigation phase of trial, and that this conduct prejudiced the outcome of the sentencing proceeding, the court finds counsel afforded Woodard constitutionally deficient assistance of counsel as raised in the first and second grounds for relief in the petition. Thus, two of the claims asserted in Woodard's Petition for a Writ of Habeas Corpus under 28 U.S.C. §2254 are well-taken. Accordingly, Woodard's request for habeas corpus relief is denied as to his conviction, and granted as to his sentence of death. The Petition is hereby dismissed.

Because the court grants Woodard's petition in part, it issues a writ of habeas corpus as follows. The Respondent shall either: (1) set aside Woodard's sentence of death and instead impose a life sentence;

or (2) conduct another sentencing trial.  The Respondent shall re-sentence Woodard, or conduct a new

sentencing proceeding, within 180 days from the effective date of this Order.  On this court's own motion,

execution of this Order and, hence, its effective date, is stayed pending appeal by the parties.

IT IS SO ORDERED.


/s/*SOLOMON OLIVER, JR.*
UNITED STATES DISTRICT JUDGE

September 30, 2005